IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| CENTER FOR SUSTAINABLE ECONOMY, LEGACY FOREST DEFENSE COALITION and SAVE THE OLYMPIC PENINSULA,<br><br>               Respondents,<br><br>    v.<br><br>WASHINGTON STATE DEPARTMENT OF NATURAL RESOURCES, BOARD OF NATURAL RESOURCES, WASHINGTON STATE DEPARTMENT OF ECOLOGY; and COMMISSIONER OF PUBLIC LANDS HILARY FRANZ, in her official capacity,<br><br>               Appellants. | No. 86667-2-I<br><br>ORDER DENYING MOTION FOR RECONSIDERATION, WITHDRAWING OPINION, AND SUBSTITUTING OPINION |

The Respondents have moved for reconsideration of the published opinion filed on February 17, 2026. The panel has considered the motion and has determined that the motion should be denied, the opinion should be withdrawn, and a substitute opinion be filed.

Now, therefore, it is hereby

ORDERED that the respondent's motion for reconsideration is denied; and it is further

ORDERED that the published opinion filed on February 17, 2026, is withdrawn; and it is further

ORDERED that a substitute published opinion be filed.

_Cohen, J._

Díaz, J.

_Smith, J._

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| CENTER FOR SUSTAINABLE ECONOMY, LEGACY FOREST DEFENSE COALITION and SAVE THE OLYMPIC PENINSULA,<br><br>     Respondents,<br><br>  v.<br><br>WASHINGTON STATE DEPARTMENT OF NATURAL RESOURCES, BOARD OF NATURAL RESOURCES, WASHINGTON STATE DEPARTMENT OF ECOLOGY; and COMMISSIONER OF PUBLIC LANDS HILARY FRANZ, in her official capacity,<br><br>     Appellants. | No. 86667-2-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

COBURN, J. — One hundred acres of forest-land held in trust by the State are subject of this appeal. The State proposed harvesting this land as part of an approved, long-term sustainable harvest level decade plan. That plan was based on a final environmental impact statement that considered climate change impacts from a landscape perspective of all Western Washington forested land held in trust. The Department of Natural Resources (DNR) issued a determination of nonsignificance for the harvest, which several environmental groups challenged. The superior court rejected the determination and ordered the state agency to (1) assess site-specific climate change impacts; and (2) to consider, as required under RCW 43.21C.030(2)(e),

proposed alternative uses for the specific subject resources. We conclude the determination of nonsignificance was not clearly erroneous and strike the superior court's order requiring DNR to conduct a site-specific climate impact assessment but hold that DNR must comply with RCW 43.21C.030(2)(e) before any future sale can be approved. Accordingly, we reverse in part, affirm in part, and remand.

BACKGROUND

The Washington State Department of Natural Resources (DNR) and the Board of Natural Resources (Board) manage approximately three million acres of forested state-owned lands. Conservation Nw. v. Franz, 199 Wn.2d 813, 817, 514 P.3d 174 (2022). Pursuant to the Omnibus Enabling Act of 1889, ch. 180, 25 Stat. 676 (Enabling Act), the federal government granted to the State of Washington several hundreds of thousands of acres of land. Conservation Nw., 199 Wn.2d at 817. "This significant land grant was made 'for the support of common schools' and other state institutions." Id. Our state Supreme Court determined that the Enabling Act "make[s] clear that the federal government intended to create a trust whereby the State accepted control of the granted lands with the express understanding that the lands were not its absolute property but, instead, were to be held and used exclusively for the enumerated purposes." Id. at 826. Additionally, pursuant to RCW 79.22.040, individual counties have granted land to the State "with the explicit understanding that they are held in trust for the benefit of those counties." Id. at 817.

"The creation of a trust imposes several key duties on the trustee." Id. at 829. "With respect to trusts in land, specifically, the trustee owes a general duty 'to use reasonable care and skill to make the trust property productive' through leasing or

2

managing it to generate income.'" Id. at 829-30 (citing RESTATEMENT (SECOND) OF TRUSTS § 181 & cmt. a (A.L.I. 1959)).

The Enabling Act did not restrict the State to a specific actual use of granted lands. Id. at 833. Rather, the state legislature requires DNR to utilize a "multiple use" concept in administering public lands. RCW 79.10.120. Accordingly, "[t]here appear to be myriad ways DNR could choose to generate revenue from the state and forest board lands or otherwise put them to use for the benefit of the enumerated beneficiaries." Conservation Nw., 199 Wn.2d at 833-34.

One such way was through the Habitat Conservation Plan (HCP), which DNR created in 1997 to conserve habitat for endangered species. This plan was submitted to the United States Department of Fish and Wildlife and the National Marine Fisheries Service for review to determine whether the plan complied with the Endangered Species Act of 1973, 16 U.S.C §§ 1531-1544. The HCP covers around 1.6 million acres of DNR-managed state forest-land, conserving the habitat of the marbled murrelet, riparian-dependent species, and other species. As a result of creating the HCP, the U.S. Department of Fish and Wildlife granted DNR an "incidental take permit," shielding it from liability under the Endangered Species Act. The incidental take permit allowed DNR to harvest land under the HCP without violating the Endangered Species Act.

The HCP was amended in 2019 based on a long-term conservation strategy for the marbled murrelet, known as "Resolution No. 1559," and a new incidental take permit was granted to DNR. Conservation Nw., 199 Wn.2d at 819. DNR based its selection of Resolution No. 1559 on the "Long-Term Strategy for the Marbled Murrelet Final Environmental Impact Statement" (Marbled Murrelet FEIS). The Marbled Murrelet FEIS

3

considered eight conservation alternatives, including a "no action" alternative that represented a range of conservation strategies for the marbled murrelet on DNR-managed land. At the time the Marbled Murrelet FEIS was conducted, 1.38 million acres of DNR-managed lands were analyzed and under each alternative it was approximated that between 576,000-743,000 forest acres would be protected. The Board selected the eighth alternative, known as "Alternative H," which conserved 604,466 acres.[1]

The legislature also specifically directs DNR to "manage the state-owned lands under its jurisdiction which are primarily valuable for the purpose of growing forest crops on a sustained yield basis" so that timber is harvested "on a continuing basis without major prolonged curtailment or cessation of harvest." RCW 79.10.310, .320. "To this end, the department shall periodically adjust the acreages designated for inclusion in the sustained yield management program and calculate a sustainable harvest level."[2] RCW 79.10.320.

For the stated purpose of meeting its obligations under local, state, and federal laws consistent with its policies, including the HCP, DNR proposed to establish a sustainable harvest level for the 2015-2024 planning decade for forested state trust lands in western Washington. In compliance with the State Environmental Policy Act (SEPA), ch. 43.21C RCW, DNR issued the 2019 final environmental impact statement (FEIS) on alternatives for the establishment of a sustainable harvest level to assist in establishing a sustainable harvest level. Under the 2019 FEIS, DNR analyzed six

---

[1] Notably, the Marbled Murrelet Strategy included 441 additional acres to Alternative H located in southwest Washington. Therefore, the total acres conserved under the Marbled Murrelet Strategy was 604,907.

[2] RCW 79.10.300(5) defines "[s]ustainable harvest level" as "the volume of timber scheduled for sale from state-owned lands during a planning decade as calculated by the department and approved by the board."

alternatives, including a no action alternative, which represented a range of harvest levels based on the conservation alternatives explored in the Marbled Murrelet Strategy, options for how to best address arrearage[3] volume from the previous planning decade,[4] and options for riparian thinning from the HCP. The Board selected the sixth alternative under "Resolution No. 1560," which averaged 11,400 acres harvested and 1,600 acres thinned[5] annually. This represents about 0.87 percent of the 1.5 million acres of DNR-managed forest-land in Western Washington. In 2020 our state Supreme Court rejected a constitutional challenge to Resolutions 1559 and 1560 while recognizing that "[u]sing granted state and forest board lands as productive trust property aligns with DNR's general trustee duties and provides a benefit to the general population by boosting local economies as well as maintaining stronger and better-funded public systems of education and governance." Conservation Nw., 199 Wn.2d at 835 (holding that the State's land management strategies do not conflict with Washington Constitution article XVI, section 1, which states "[a]ll the public lands granted to the state are held in trust for all the people"). Id. at 827, 832.

## FACTS AND PROCEDURAL HISTORY

In 2023 DNR applied to harvest approximately 100 acres of DNR-managed forest land (Wishbone Timber Sale), located about 11 miles north of Carnation in King County.

---

[3] RCW 79.10.300(1) defines "[a]rrearage" as "the summation of the annual sustainable harvest timber volume since July 1, 1979, less the sum of state timber sales contract default volume and the state timber sales volume deficit since July 1, 1979."

[4] The previous planning decade was 2005 to 2014.

[5] The HCP defined precommercial thinning as "[c]utting trees at an immature age to allow for better growth of the remaining trees; may include removal of excess and/or diseased trees in the 10-35 year class" and commercial thinning as "[t]he removal of generally merchantable trees from an even-aged stand, so that the remaining trees can develop faster and with less competition."

As required by SEPA, DNR reviewed the proposed Wishbone Timber Sale for potential environmental impacts. After engaging in an "environmental checklist" pursuant to WAC 197-11-315, DNR issued a determination of nonsignificance (DNS). Within the environmental checklist, DNR discussed air emissions, stating that "[h]arvest operations and the removal of timber will result in minor amounts of $CO_2$ [carbon dioxide] emissions from the direct proposal site." To support this conclusion, DNR referred to the 2019 FEIS.[6] DNR stated that "[f]ollowing harvest, native tree species will be planted on site at a level higher than existed prior to harvest resulting in regeneration of the forest stand and initiating carbon sequestration through forest stand growth."

The Center for Sustainable Economy, Legacy Forest Defense Coalition, and Save the Olympic Peninsula (collectively referred to as "Coalition") expressed concerns during the review for public comment. The Coalition presented several reasons why DNR wrongly issued the DNS. Generally, it claimed that DNR (1) failed to conduct project-level review of climate change impacts, (2) relied on outdated data from the 2019 FEIS and should instead consider new data including the 2020-published "Washington Forest Ecosystem Carbon Inventory" (2020 carbon inventory) and 2019-published research letter, Tara W. Hudiburg et al., Meeting GHG Reduction Targets Requires Account for All Forest Sector Emissions, 14 ENV'T RSCH. LETTERS 09500 (2019) (Hudiburg 2019 letter); and (3) did not consider and disclose alternatives to the Wishbone Timber Sale. The Coalition also discussed the Wishbone Timber Sale's long-term harmful effects on climate change and climate resiliency, including GHG

---

[6] DNR also relied on another FEIS from 2019 on the long-term conservation strategy for the marbled murrelet. Both parties only briefly refer to this FEIS, which is indicated where relevant.

(greenhouse gas) emissions, loss of carbon sequestration capacity, and increased vulnerability to climate structures. DNR retained its DNS and provided a response to the Coalition's comments.

The Board authorized the Wishbone Timber Sale. The Coalition filed a timely appeal to the King County Superior Court under RCW 79.02.030 (Public Lands Act) and RCW 43.21C.075 (SEPA) seeking review of the Board's approval of the Wishbone Timber Sale. The court reversed the Board and directed DNR on remand to assess site-specific climate change impacts and study, develop, and describe reasonable alternatives as required by RCW 43.21C.030(2)(e).

DNR appeals.

## DISCUSSION

### SEPA Process

SEPA requires the analysis and disclosure of probable significant environmental impacts of a proposal. WAC 197-11-060(4). A proposal may either be a particular development proposal (a project action), or a legislative or policy change (a nonproject action). WAC 197-11-704. The first step in the SEPA process is for an agency to determine whether a proposal will "significantly affect[] the quality of the environment." RCW 43.21C.030(c). This step is known as a "threshold determination." RCW 43.21C.033; WAC 197-11-310. A "significant" impact is one where "reasonable likelihood" exists that the proposal will have "more than a moderate adverse impact on environmental quality." WAC 197-11-794(1). WAC 197-11-330(3) also directs decision-makers to consider a variety of factors in making this determination. "Still, a precise and workable definition [of "significant"] is elusive because judgments in this area are

particularly subjective—what to one person may constitute a significant or adverse effect on the quality of the environment may be of little or no consequence to another." Norway Hill Pres. & Prot. Ass'n v. King County Council, 87 Wn.2d 267, 277, 552 P.2d 674 (1976).

SEPA provides a required checklist under WAC 197-11-960 to assist agencies in making threshold determinations. See also WAC 197-11-315. Threshold determinations must be based on "information reasonably sufficient to evaluate the environmental impact of a proposal" and take additional steps if such information is not available. WAC 197-11-335. "A threshold determination shall not balance whether the beneficial aspects of a proposal outweigh its adverse impacts, but rather, shall consider whether a proposal has any probable significant adverse environmental impacts." WAC 197-11-330(5) (emphasis added). A threshold determination produces either a determination of significance (DS) or a DNS. WAC 197-11-310(5). If an agency determines that a proposal will not significantly affect the environment, it issues a DNS and an environmental impact statement (EIS) is not required. WAC 197-11-734. Likewise, a DS requires an EIS. WAC 197-11-736.

<u>Standard of Review</u>

In reviewing a SEPA decision, we sit in the same position as the superior court and apply the SEPA standards of review directly to the Board's decision. Wenatchee Sportsmen Ass'n v. Chelan County, 141 Wn.2d 169, 176, 4 P.3d 123 (2000). We review a threshold determination such as a DNS under the clearly erroneous standard. King County v. Wash. State Boundary Rev. Bd., 122 Wn.2d 648, 661, 860 P.2d 1024 (1993). An agency decision is clearly erroneous "'when although there is evidence to support it,

the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" Norway Hill Pres. & Prot. Ass'n, 87 Wn.2d at 274 (quoting Ancheta v. Daly, 77 Wn.2d 255, 259, 461 P.2d 531 (1969)). "The record must show that relevant environmental factors were considered in a way that sufficiently amounts to prima facie compliance with the requirements of SEPA." King County v. Friends of Sammamish Valley, 3 Wn.3d 793, 816, 556 P.3d 132 (2024). However, "[a]n agency does not have to consider every conceivable environmental impact when making its threshold SEPA determination." PT Air Watchers v. Dep't of Ecology, 179 Wn.2d 919, 932, 319 P.3d 23 (2014); WAC 197-11-060(4)(a).

The Coalition has the burden to demonstrate that DNR's action was invalid. RCW 34.05.570(1)(a).

SEPA requires that the court give substantial weight to governmental agency decisions. RCW 43.21C.090. Courts recognize and defer to the administrative agency's environmental expertise. Wild Fish Conservancy v. Wash. Dep't of Fish & Wildlife, 198 Wn.2d 846, 866, 502 P.3d 359 (2022).

Additionally, "'the court is required to consider the public policy and environmental values of SEPA'" when reviewing a SEPA action. Id. at 866-67 (quoting Sisley v. San Juan County, 89 Wn.2d 78, 84, 569 P.2d 712 (1977)). SEPA ensures that environmental values are given appropriate consideration and "does not demand any particular substantive result in governmental decision making." Stempel v. Dep't of Water Res., 82 Wn.2d 109, 118, 508 P.2d 166 (1973). Finally, we may look to federal case law for SEPA interpretation because the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321-4347, is substantially similar to SEPA. Int'l Longshore &

Warehouse Union, Loc. 19 v. City of Seattle, 176 Wn. App. 512, 525, 309 P.3d 654 (2013).

### Determination of Nonsignificance

The Coalition contends that DNR's DNS was clearly erroneous because DNR (1) failed to conduct a project level analysis of climate impacts as required by SEPA, (2) relied on incorrect, outdated, conclusions of climate impacts in violation of SEPA, (3) did not take a "hard look" at climate impacts of the Wishbone Timber Sale, and (4) was required to analyze alternatives under RCW 43.21C.030(2)(e).

### Project-Level Analysis

The Coalition first contends that a project-level analysis is required because SEPA allows an agency to "phase" its environmental review under WAC 197-11-776 and WAC 197-11-060(5)(b). Under this phased review, "[b]roader environmental documents may be followed by narrower documents, for example, that incorporate prior general discussion by reference and concentrate solely on the issues specific to that phase of the proposal." WAC 197-11-060(5)(b) (emphasis added). Additionally, "[w]hen a lead agency knows it is using phased review, it shall so state in its environmental document." WAC 197-11-060(5)(e). This argument is unavailing because (1) phased review is optional and, even if utilized, it is optional to include narrower environmental documents and (2) DNR did not state that it was utilizing phased review.

Next, the Coalition argues that WAC 197-11-443 requires project-level analysis because it states that an EIS on a project that is consistent with an approved nonproject action "shall focus on the impacts and alternatives including mitigation measures specific to the subsequent project." But the Coalition refers to SEPA rules that apply

after a DS has been made, requiring an EIS. See WAC 197-11-443, -736. In the instant case, DNR issued a DNS, meaning that an EIS is not required. WAC 197-11-734.

Turning to the 2019 FEIS, the Coalition points to the fact that the 2019 FEIS states that individual projects within its analysis area, which includes the Wishbone Timber Sale, will be subsequently reviewed under SEPA, and, thus, they argue that site-specific analysis of carbon emissions and climate change impacts are required. The 2019 FEIS specifically states that "[a]s a non-project action under SEPA, the sustainable harvest level is not site-specific. Supplemental review of site-specific projects such as timber sales…will occur under SEPA."[7] However, the 2019 FEIS also states that "[c]arbon sequestration is analyzed at the scale of DNR-managed lands in western Washington…because a determination of net carbon emissions for each alternative must consider both the carbon sequestered in the analysis area and the emissions from managing the same area."

The fact that the 2019 FEIS states that site-specific projects will be reviewed under SEPA does not mean that it must conduct a project-level analysis of the Wishbone Timber Sale's carbon emissions and climate impacts under SEPA. Rather, site-specific projects, such as the Wishbone Timber Sale, are subject to SEPA analysis, which includes an environmental checklist and threshold determination of whether the project significantly affects the quality of the environment.

DNR cites PT Air Watchers to argue that a SEPA environmental checklist only needs to provide sufficient information to evaluate the general change in GHG

---

[7] The Marbled Murrelet FEIS contains similar language: "[r]eview under SEPA occurs at each stage of planning" and "[s]upplemental review of site-specific projects such as timber sales…will occur under SEPA."

emissions. In <u>PT Air Watchers</u>,[8] the court stated that the failure to provide specific carbon emissions estimates was irrelevant for the environmental checklist of a proposal to construct a new cogeneration project at a paper mill. 179 Wn.2d at 923, 930. The checklist demonstrated the legislature's preference for burning woody biomass. <u>Id.</u> at 929. The checklist also indicated that, because of the project, the paper mill would decrease the amount of fossil fuels burned by 1.8 million gallons per year. <u>Id.</u> at 928-29. Given this information, the court concluded that it was appropriate for the Department of Ecology to assume that the project would decrease the total amount of carbon dioxide in the environment from the mill's power boiler. <u>Id.</u> The court held that the Department of Ecology properly considered legislative policy in performing its threshold SEPA analysis and concluded that GHG from the project would not have significant environmental impacts. <u>Id.</u> at 930.

DNR maintains that the holding in <u>PT Air Watchers</u> applies in the instant case where the legislature prioritizes preservation of working forests and sustainable, commercial forestry. (Citing RCW 70A.45.090.) However, in <u>PT Air Watchers</u>, our state Supreme Court noted that such legislative preference "is a legitimate reference point for a lead agency's consideration … <u>but cannot be read as determinative of any particular project's impact on the environment</u>." 179 Wn.2d at 929 (emphasis added) (citation omitted). Thus, the existence of legislative directive, while a reference point, is not determinative of whether a DNS requires project-level analysis under SEPA.

In the instant case, we have more than the legislative directive. We have a 2019 FEIS that considered the climate change impacts at a landscape level, consistent with

---

[8] The <u>PT Air Watchers</u> court analyzed former RCW 70.235.020(3), which is now codified as RCW 70A.45.090. 179 Wn.2d at 929; LAWS OF 2020, ch. 20, § 2052.

the Intergovernmental Panel on Climate Change (IPCC). The legislature directs DNR to harvest its managed lands on a continuing basis. RCW 79.10.310. The 2019 FEIS was issued in relation to DNR's establishment of a sustainable harvest level for the 2015-2024 planning decade for forested state trust lands in Western Washington. Notably, DNR explained that it analyzes climate impacts at the landscape level because this is how Washington State, the United States, and the IPCC[9] analyze climate impacts associated with the forestry sector. The IPCC reported that "[w]hile individual stands in a forest may be either sources or sinks,[10] the forest carbon balance is determined by the sum of the net balance of all stands." INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, CLIMATE CHANGE 2007: MITIGATION OF CLIMATE CHANGE 549 (2007), https://www.ipcc.ch/site/assets/uploads/2018/03/ar4_wg3_full_report-1.pdf. The IPCC recognizes the complexity of forest management and climate change:

> The design of a forest sector mitigation portfolio should consider the trade-offs between increasing forest ecosystem carbon stocks and increasing the sustainable rate of harvest and transfer of carbon to meet human needs. The selection of forest sector mitigation strategies should minimize net GHG emissions throughout the forest sector and other sectors affected by these mitigation activities. For example, stopping all forest harvest would increase forest carbon stocks, but would reduce the amount of timber and fibre available to meet societal needs. Other energy-intensive materials, such as concrete, aluminum, steel, and plastics, would be required to replace wood products, resulting in higher GHG emissions.

Id. (citation omitted). With this in mind, the IPCC recommends that "[f]orest mitigation strategies should be assessed within the framework of sustainable forest management."

Id. Such management may include "[p]lanting after harvest or natural disturbances

---

[9] The United Nations and the World Meteorological Organization established the IPCC to provide an authoritative international statement and scientific understanding of climate change.
[10] Carbon sources emit more carbon dioxide than they absorb, and carbon sinks absorb more carbon dioxide than they emit.

[which] accelerates tree growth and reduces carbon losses relative to natural regeneration." Id. at 551.

DNR agrees with the Coalition's conclusion that carbon loss occurs during timber harvest, including the Wishbone Timber Sale, "[b]ut how DNR manages each stand is wholly dependent on how the agency manages every other stand." Under DNR's sustainable harvest level plan, it is estimated that DNR will harvest 11,400 acres and thin 1,600 acres, representing 0.87 percent of the 1.5 million acres of forested land DNR currently manages in Western Washington. The proposal for the Wishbone Timber Sale included a plan for reforestation by planting native conifer species. In fact, the trees to be harvested from the Wishbone Timber Sale originate between around 85-100 years ago and are second growth naturally regenerated conifer stands, meaning that these trees naturally regrew following a previous timber harvest.[11]

The Coalition has not met its burden to show that DNR's reliance on a landscape level FEIS for climate change impacts and carbon emissions was clearly erroneous.

<u>Reliance on 2019 FEIS</u>

The Coalition avers that DNR erred when it relied on the 2019 FEIS' conclusion that, at the Western Washington scale, land management activities on DNR-managed lands sequester more carbon than they emit.

To the extent the Coalition grounds its argument on the belief that DNR was required to conduct an analysis at the project-level instead of the landscape level, that argument has been addressed and rejected above. Nonetheless, we address the Coalition's claim that DNR's conclusion from the 2019 FEIS—that in Western

---

[11] The origins of the Wishbone Timber Sale stand are between 1926 and 1942.

Washington, DNR forestlands emit less carbon than they take in—is not supported

because it is premised on outdated data and contradicted by more recent data.

Specifically, the Coalition cites the 2020 carbon inventory's conclusion:

Although the estimate for net annual change on WA-DNR … forest lands
is negative (-0.1 ± 4.2MMT [million metric tons] CO2-e [carbon dioxide
equivalent] … per year …) the variation in the estimate of current annual
growth when accounting for trees removed through management activities
is too large to determine if the average net annual rate of carbon
sequestration is statistically different from zero.

Additionally, the Coalition cites the Hudiburg 2019 letter's finding that logging operations

in Washington State emit 32 million metric tons of CO2-e annually.

DNR correctly notes that neither of these sources relied on more recent data.

The 2019 FEIS relied primarily on research from 2006 and 2018. The 2020 carbon

inventory, although published in 2020, was based on remeasured forest and industry

analysis plots that spanned an initial measurement period from 2002 to 2011 and

remeasurement from 2012 to 2016. The Hudiburg 2019 letter developed a modified and

expanded life-cycle assessment of forest sector emissions and sequestration from

24,000 forest inventory plots in Washington, Oregon, and California from 2001 to 2016.

Moreover, DNR argues that, substantively, the conclusions of both sources the

Coalition relies on cannot speak to the 2019 FEIS, which addressed proposed

alternatives for the fiscal year 2015 to 2024 planning decade for more than 1.4 million

acres of forested state trust lands in Western Washington.

The Coalition's quoted conclusion from the 2020 carbon inventory was

incomplete. The conclusion actually states:

Although the estimate for net annual change on WA-DNR and private
corporate forest lands is negative (-0.1 ± 4.2 MMT CO2e and -0.9 ± 6.5
MMT CO2e per year respectively), the variation in the estimate of current

annual growth when accounting for trees removed through management activities is too large to determine if the average net annual rate of carbon sequestration is statistically different from zero.

(Emphasis added.) Thus, the 2020 carbon inventory was not only based on older data but also based on different data.[12]

The Hudiburg 2019 letter calculated the regional forest carbon balance from over 24,000 forest inventory plots in Washington, Oregon, and California. Moreover, the Hudiburg 2019 letter did separate the data between the three states, but it did not distinguish between state-owned trust lands and other forest inventory plots. And while it reported that between 2001 and 2016 the forest industry in Washington emitted a total of 32 million metric tons of $CO_2$-e annually, the Coalition fails to acknowledge that when applying the carbon sink from the forest industry for the same period, the net forest sector carbon balance was -64.3 million metric tons. A negative number indicates removal of carbon from the atmosphere and a positive number indicates the addition of carbon in the atmosphere. Thus, like the 2020 carbon inventory, the Hudiburg 2019 letter relies on past, different data. Even so, the Hudiburg 2019 letter concluded that the overall net balance of forest industry practices between 2001 and 2016 resulted in a negative net balance of carbon in the atmosphere.

---

[12] The 2020 carbon inventory did break down forest-land by ownership and estimated that DNR-managed lands in all of Washington totaled 2,190,000 acres between 2007 and 2016. The Coalition does not cite any conclusions based on just DNR-managed lands. Because we hold that the 2020 carbon inventory is distinguishable, we need not consider the Coalition's reliance on a declaration from Dr. Dominick DellaSala, who has studied forests for over three decades because Dr. DellaSala's carbon estimates were based on the 2020 carbon inventory. Specifically, Dr. DellaSala estimated that, based on the 2020 carbon inventory, DNR's logging activities likely result in 4.4 million metric tons of carbon emissions per year, compared to the 2019 FEIS' conclusion of 100,000 tons of carbon emissions per year. Such a comparison is not helpful when the data relied on is not more recent and is based on an analysis of mostly non DNR-managed land.

We do not suggest that any DNS of a timber sale cannot be challenged when DNR relies on the 2019 FEIS. Here, DNR did not refuse to consider the Coalition's comments and cited studies. It just found them distinguishable. After DNR distinguished the 2020 carbon inventory and the Hudiburg 2019 letter in its response brief, the Coalition appeared to back away from relying on those studies, which they then described in their reply brief and at oral argument as merely garnishment. Wash. Ct. of Appeals oral arg., Ctr. for Sustainable Econ. v. Dep't of Nat. Res., No. 86667-2-I (Oct. 31, 2025), at 6 min., 36 sec. through 6 min., 45 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2025101184/.

The Coalition did not meet its burden in showing that DNR's reliance on the 2019 FEIS instead of the 2020 carbon inventory or the Hudiburg 2019 letter was clearly erroneous.

"Hard Look" Doctrine

The Coalition contends that DNR failed to collect adequate information about and take a "hard look" at GHG emissions, the loss of carbon sequestration capacity, or the increased vulnerability to climate change.

The District of Columbia Court of Appeals first introduced the "hard look" doctrine in 1972, which the United States Supreme Court recognized in 1976. Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21, 96 S. Ct. 2718, 49 L. Ed. 2d 576 (1976) (citing Nat. Res. Def. Council v. Morton, 148 U.S. App. D.C. 5, 458 F.2d 827, 838 (1972)). When taking a "hard look" at an agency action, the Ninth Circuit Court of Appeals has generally considered whether the decision was "'fully informed and well-considered.'" Wild Fish

17

Conservancy, 198 Wn.2d at 872 (internal quotation marks omitted) (quoting Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1211 (9th Cir. 1998)).

The Coalition first argues that the 2019 FEIS is inadequate because it was prepared only to consider the environmental impacts of DNR's sustainable harvest level for the fiscal year 2015 to 2024 planning decade. We observe that DNR applied to harvest the Wishbone Timber Sale within the planning decade.

Next, the Coalition argues that the 2019 FEIS does not contain sufficient information on carbon emissions and sequestration because the 2019 FEIS focused only on carbon sequestered and emitted from harvested wood products. However, the 2019 FEIS analyzed the carbon impacts that the Coalition contends are missing, including carbon sequestered in forests, carbon sequestered in and emitted from harvested wood and carbon emitted from land-management activities. The Coalition's claims are grounded in its argument that DNR erred in not conducting an analysis of climate change impacts specifically for the Wishbone Timber Sale. As discussed above, DNR's threshold determination of climate change impact at the landscape level based on the 2019 FEIS was not clearly erroneous.

Finally, the Coalition alleges that the 2019 FEIS did not consider the reduction in carbon sequestration associated with DNR's logging program from "natural" levels or indicate how much more carbon could be captured on the landscape level if logging pressures were eliminated. The Coalition indicates that this is "plainly evident because DNR limited its considerations of alternatives to those with high logging levels and excluded a true 'no action' alternative." The 2019 FEIS indicates otherwise. The 2019 FEIS explained that should the Board not select one of the proposed alternatives, by

18

which it was taking no action, then the last sustainable harvest level Board resolution passed in 2007 would remain. To the extent the Coalition wishes to directly challenge the 2019 FEIS or the Board's 2007 decision, that opportunity has long passed and is not properly before this court. Notably, at oral argument, the Coalition stated that it was not challenging the adequacy of the 2019 FEIS' landscape analysis. Wash. Ct. of Appeals oral arg., supra, at 4 min., 13 sec. through 4 min., 25 sec. Additionally, a "no action" analysis is required only after an agency has made its threshold determination that an EIS is required. Wild Fish Conservancy, 198 Wn.2d at 869 (citing WAC 197-11-440(5)).

The Coalition has not presented any persuasive argument that the Board failed to take a "hard look" at GHG emissions, the loss of carbon sequestration capacity, or the increased vulnerability to climate change.

Alternatives Analysis Under RCW 43.21C.030(2)(e)

The Coalition asserts that the Wishbone Timber Sale presents "unresolved conflicts concerning alternative uses of available resources" under RCW 43.21C.030(2)(e), warranting an alternatives analysis. DNR maintains that it is not required to analyze alternatives under subsection (2)(e) because "DNR's forested trust land management does not raise such conflicts," and even if it did, DNR has complied with the statute by adopting mitigation measures.

"The legislature, through SEPA, 'authorize[d], and direct[ed] … to the fullest extent possible … [that] all branches of government … shall … [s]tudy, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources.'" Id. at 861 (emphasis added) (alterations in original) (quoting RCW 43.21C.030(2)(e)).

19

"We review questions of law and an agency's application of the law to the facts de novo, but we give the agency's interpretation of the law great weight where the statute is within the agency's special expertise." Cornelius v. Dep't of Ecology, 182 Wn.2d 574, 585, 344 P.3d 199 (2015). Our Supreme Court already interpreted RCW 43.21C.030(2)(e) in Wild Fish Conservancy, 198 Wn.2d at 857-66, which both parties cite. The Wild Fish Conservancy court observed that while the legislature directs us to accord substantial deference to the state Department of Ecology's interpretation of SEPA,[13] the agency's regulations are silent regarding subsection (2)(e). Id. at 860.

"[T]he subsection (2)(e) alternatives analysis is independent of the alternatives requirement under an EIS. Therefore, an agency may be required to assess alternatives to a proposal that is not likely to result in significant adverse environmental impacts." Id. at 862; see also RCW 43.21C.030(2)(c)(iii) (requiring every EIS to include a "detailed statement" on "alternatives to the proposed action"). The Supreme Court held that

> an alternatives analysis is appropriate when a proposal involves a competition over the use of a resource whereby selecting one manner of using the resource will preclude all other uses. These competing uses cannot be theoretical. The choice is between different uses of available resources. The competing options for how to use the resource must concern a resource that is actually capable of being used to accomplish its relative purpose. Finally, this competition must be unsolved, unsettled, or, in other words, actively in dispute.

Wild Fish Conservancy, 198 Wn.2d at 864-65.

In Wild Fish Conservancy, the court held that an alternatives analysis under subsection (2)(e) was not required for a permit requesting to transition a farm fishing

---

[13] "The legislature expressly authorized [the Department of] Ecology to adopt and amend the rules of interpretation of SEPA to provide statewide guidance on how to comply with the statute's requirements." Wild Fish Conservancy, 198 Wn.2d at 860 (citing RCW 43.21C.095, .110).

lease from Atlantic salmon to steelhead trout because the transition "does not present a situation involving a choice between uses where the selection of one option would preclude the other." Id. at 865. The court observed that "[d]uring the comment period for the steelhead permit, the majority of submissions that proposed some type of alternative suggested alternatives related to siting, i.e., the location of the net pens. But the … permit does not implicate the siting of the already existing net-pen infrastructure." Id. The court also reasoned that "[b]ecause the permit authorizes [the owner] only to transition its current fish farming activities from Atlantic salmon to steelhead trout, it does not present a situation involving a choice between uses where the selection of one option would preclude the other." Id.

In the instant case, DNR maintains that an unresolved conflict does not exist because carbon sequestration will begin and continue at the Wishbone Timber Sale site once the area is replanted following harvest. Additionally, they argue there is a net carbon balance on all DNR-managed land over the next 50 years based on the 2019 FEIS. For support, DNR relies on the Pollution Control Hearings Board's (PCHB) decision in Marine Environmental Consortium v. State, Nos. 96-257 through 96-266 & 97-110, 1998 WL 933353, 1998 WA ENV LEXIS III (Wash. Pollution Control Hr'gs Bd. Nov. 30, 1998), which our state Supreme Court considered in Wild Fish. Wild Fish Conservancy, 198 Wn.2d at 863-64.

In Marine Environmental Consortium, the appellants challenged the approval of waste discharge permits for Atlantic salmon net pens and the PCHB was asked to determine whether the permits required an alternatives analysis under RCW 43.21C.030(2)(e). 1998 WL 933353, at *2, *21, 1998 WA ENV LEXIS III, *2, *57.

Though all but three of the sites already had existing operating salmon farms, at issue was the approval of waste discharge permits. 1998 WL 933353 at *2, 1998 WA ENV LEXIS III, at *2. Notably, the issue did not involve an application to lease waters for fish farming activities because "[a]ll farm activities at each site are required to be located within aquatic lands leased from the Washington Department of Natural Resources." 1998 WL 933353, at *5, 1998 WA ENV LEXIS III, at *10.

In considering whether there was an "unresolved conflict[]" requiring an alternatives analysis, the PCHB reasoned that "[t]he key factual inquiry is whether … the existence of the Permittees' facilities have impacts which effectively exclude other beneficial uses of available resources of Puget Sound." 1998 WL 933353, at *2, 1998 WA ENV LEXIS III, at *57. The PCHB determined that an alternatives analysis was not required. 1998 WL 933353, at *22, 1998 WA ENV LEXIS III, at *60. The PCHB explained in part:

> In so finding, we are mindful that salmon farms do have localized environmental impacts, as demonstrated by the monitoring data and video surveys in evidence. There is also evidence that the presence of some of the farms creates localized conflicts with recreational boating and fishing. It is self-evident that the space occupied by the farms cannot be used for navigation, recreation, shell fish aquaculture or other endeavors. However, there is no evidence that the existence of these farms and their impacts are so severe in magnitude or broad in extent that they operate to the exclusion of other beneficial uses. Moreover, in directing Ecology to permit net-pen facilities, the legislature effectively resolved any conflicts between recreational uses of the waters of the state and net-pens. The legislature has determined that the marine waters of the state shall accommodate both recreational uses and net-pen facilities. Siting decisions under the Interim Guidelines are consistent with the legislature's policy determination, because the Guidelines take into account avoidance of use conflicts and impacts on important resource areas such as sensitive fish and wildlife habitats.

1998 WL 933353, at *22, 1998 WA LEXIS III, at *59-60.

22

DNR specifically argues that the PCHB's reliance on the Puget Sound as a whole is analogous to the Wishbone Timber Sale because the remaining acres of DNR-managed land continue to sequester carbon. (Citing Marine Env't Consortium, 1998 WL 933353, at *21, 1998 WA ENV LEXIS III, at *57.) DNR also argues that the legislature has resolved any conflict between carbon sequestration and timber harvest because the Legislature and the United Nations recognize sustainable forest management strategies.

Marine Environmental Consortium is distinguishable. First, the resource in Marine Environmental Consortium is one that is a connected body of water—the Puget Sound. 1998 WL 933353, at *6, 1998 WA ENV LEXIS III, at *11. Second, the permits were for waste discharge and did not involve siting net pens at the permit locations. 1998 WL 933353, at *2, 1998 WA ENV LEXIS III, at *2. Third, interim guidelines exist under which siting decisions are made; these guidelines account for avoidance-of-use conflicts and impacts on important resource areas such as sensitive fish and wildlife habitat. 1998 WL 933353, at *21, 1998 WA ENV LEXIS III, at *55. More importantly, language in Wild Fish Conservancy indicates that the existence of similar resources elsewhere does not in and of itself mean that no conflict could exist. 198 Wn.2d at 865.

In Wild Fish Conservancy, despite holding that no conflict existed to trigger RCW 43.21C.030(2)(e), our state Supreme Court cautioned that "subsection (2)(e) may conceivably be triggered by a permit to expand an applicant's existing net-pen facilities because an expansion of infrastructure might result in the exclusion of other uses of the available resources, such as the use of the physical location of the new net pens." Id. (emphasis added). This language informs us that the "alternative use[] of available

23

resources" in RCW 43.21C.030(2)(e) has to do with the resources that are subject to the proposal, and not whether the existence of other similar resources elsewhere transforms a site-specific conflict to a nonexistent conflict.

In the instant case, the resource at issue is the trees designated in the Wishbone Timber Sale. The fact that new replacement trees will be planted after harvest does not mean a conflict does not exist as to the current trees that are the subject of the Wishbone Timber Sale. The regeneration of new trees may be part of the alternatives analysis, but that is different from considering it as a threshold matter to determine that no conflicts exist. Also, the fact that sustainable forest management is recognized generally, or even through the 2019 FEIS, does not answer the question as to whether RCW 43.21C.030(2)(e) applies to the Wishbone Timber Sale. The existence of a Board-approved "sustainable harvest level" for timber culled from forested state trust lands in Western Washington does not create an exemption to RCW 43.21C.020(2)(e) which applies to "'any proposal.'" Id. at 861 (quoting RCW 43.21C.030(2)(e)). Certainly, the legislature could have amended RCW 43.21C.030(2)(e) to exclude its application to DNR-managed forest-land. But that is not the case.

We hold that an alternatives analysis under subsection (2)(e) is required because the Wishbone Timber Sale presents a situation involving a choice between uses. During the comment period for the sale, the Coalition proposed

> [t]hat DNR include a "climate smart" alternative in its revised SEPA analysis that sets aside mature, old growth and legacy forest components of these projects as forest carbon reserves and uses low impact techniques like variable density thinning to accelerate the development of carbon rich late successional/old growth stand conditions in portions of the sale area occupied by dense, young timber plantations.

The proposed alternatives presented during the comment period in Wild Fish

24

Conservancy focused on relocating existing net pens, despite the fact that the permit at issue was transitioning the type of fish to be farmed, not the approval of a fish farm site. Id. at 851. In the instant case, the Coalition presented an alternative use of the subject forest. The Coalition suggested setting aside mature, old growth, legacy forest components of the project as forest carbon reserves and using low impact techniques like variable density thinning. Certainly, cutting down the trees precludes their use as carbon reserves, which is not just a theoretical use. We conclude that the alternatives analysis under RCW 43.21C.030(2)(e) applies to the Wishbone Timber Sale.

DNR next argues that, should the court determine that it must conduct an alternatives analysis, it complied with this requirement because DNR analyzed all the elements in the environmental checklist under WAC 197-11-960. DNR claims, with no supporting authority, that the environmental checklist is an accepted form of alternatives analysis under RCW 43.21C.030(2)(e) because its purpose is "to reduce or avoid impacts from the proposal, if it can be done." See also WAC 197-11-960. We reject this argument because doing so would render RCW 43.21C.030(2)(e) superfluous and allow DNR to disregard alternative uses proposed during the comment period. Again, RCW 43.21C.030(2)(e) applies to "'any proposal.'" Wild Fish Conservancy, 198 Wn.2d at 861 (quoting RCW 43.21C.030(2)(e)).

DNR also alleges, in the alternative, that it complied with the alternatives analysis because it considered mitigation measures to protect wildlife and the environment. DNR relies on the definition of a "reasonable alternative" under WAC 197-11-786 to argue that mitigation is sufficient for the alternatives analysis. WAC 197-11-786 states that "[r]easonable alternatives may be those over which an agency with jurisdiction has

25

authority to control impacts, either directly, or indirectly through requirement of mitigation measures." But the "reasonable alternatives" relates to mitigation in WAC 197-11-786, which is not the same as considering alternative uses of available resources as required in RCW 43.21C.030(2)(e). The legislature specifically directed DNR, through SEPA, to "[s]tudy, develop, and describe <u>appropriate</u> alternatives…." RCW 43.21C.030(2)(e) (emphasis added). DNR cites no authority supporting that the reasonable alternatives definition from WAC 197-11-786 applies to RCW 43.21C.030(2)(e).

According to the 2019 FEIS, DNR relies on a mathematical computer model to classify its forested land base into areas that have similar geographic attributes, known as development types.

> [T]he model develops an optimal solution of which development types to harvest (when, where, and by what harvest method) and which not to harvest across forested state trust lands over time to meet both revenue production and ecological value objectives as effectively and efficiently as possible. To make these decisions, the model considers numerous interrelated factors, such as when the development type will be mature enough to harvest, whether or not it is deferred from harvest, how it may contribute to the objectives of DNR's conservation strategies, and how it may contribute to revenue production.

Thus, it appears when a conflict of use comes up as to a specific proposal, DNR should be able to easily meet its obligation to study, develop, and describe appropriate alternatives as required by RCW 43.21C.030(2)(e). Because the record does not include such information, we conclude that DNR has not conducted an alternatives analysis as it is required to do under subsection (2)(e). On remand, DNR is not barred from considering information relied on for other purposes when it properly considers the Coalition's proposed alternatives in compliance with RCW 43.21C.030(2)(e).

26

Attorney Fees

The Coalition requests attorney fees under the Equal Access to Justice Act

(EAJA), codified at RCW 4.84.350. That statute states:

> Except as otherwise specifically provided by statute, a court shall award a
> qualified party that prevails in a judicial review of an agency action fees
> and other expenses, including reasonable attorneys' fees, unless the court
> finds that the agency action was substantially justified or that
> circumstances make an award unjust. A qualified party shall be
> considered to have prevailed if the qualified party obtained relief on a
> significant issue that achieves some benefit that the qualified party sought.

RCW 4.84.350(1). The Coalition is not entitled to attorney fees because their claim does

not allow for attorney fees under the EAJA. The EAJA applies to "judicial review of an

agency action." Id. An agency action is defined under RCW 34.05.010(3) and in

subsection (3)(c) excludes from it "any sale, lease, contract, or other proprietary

decision in the management of public lands or real property interests."

The Coalition argues that their claim applies under the EAJA because they

brought an action under SEPA and the EAJA applies to the implementation of a statute.

See RCW 34.05.010(3) (stating that an "agency action" includes "the implementation or

enforcement of a statute"). However, SEPA does not create a standalone cause of

action and violations of SEPA must be linked to a specific governmental action. RCW

43.21C.075(1). We deny the Coalition's request for attorney fees.

CONCLUSION

DNR's DNS was not clearly erroneous. We reverse the superior court, reinstate

the DNS that was issued for the Wishbone Timber Sale, and strike the superior court's

directive that DNR must conduct a site-specific assessment of climate change impacts.

But we affirm the superior court's order requiring DNR to comply with RCW

27

43.21C.030(2)(e) before the Board may approve the Wishbone Timber Sale, and remand.

Coburn, J.

WE CONCUR:

Díaz, J.

Smith, J.